[File No. 6278.]

LAWRENCE JESSEN, JR., Respondent, v. BERTHA GRONE-MEIER PINGEL, et al., Harriette Bohlig and William Henry Bohlig, a Mentally Incompetent Person, by Harriette Bohlig, Guardian of His Person and Estate, Appellants.

(257 N. W. 2.)

Opinion filed October 10, 1934.   Rehearing denied November 8, 1934.

*Buck & Buck,* for appellants.
*S. E. Ellsworth,* for respondent.

MOELLRING, J. This is an appeal from a judgment in favor of the plaintiff and against the defendants, Harriette Bohlig and William Henry John Bohlig, an alleged incompetent, permitting plaintiff to redeem under a certain real estate contract, and for specific performance of the contract. This appeal is taken from the whole judgment, and a trial de novo is demanded by said defendants. The trial court made findings of fact and conclusions of law, upon which judgment was entered. Said defendants on this appeal present nine specifications of error, the first three of which are with reference to findings of fact by the trial court, and the remaining specifications concern the conclusions of law which the trial court had drawn from the facts found.

In this case there is no dispute as to the material facts disclosed by the evidence, which are as follows: In November, 1928, one Bertha Gronemeier Pingel, who was then the owner in fee of the lands involved, entered into a written contract with the plaintiff, Lawrence Jessen, wherein she agreed to convey to the plaintiff, upon the consideration named therein, the lands and premises described as the West Half of Section 13, Township 138, Range 63. The consideration stated in the contract is $8,000, of which the sum of $1,500 was paid at the time of the execution of the instrument. The remainder of the purchase price was payable, $100 per year with interest at six per cent payable annually, and plaintiff was to pay all taxes thereafter levied and assessed against the land.

Plaintiff took charge of the land and on January 1, 1930, was married, and he and his wife have resided thereon at all times thereafter and made it their home. Since execution of the contract plaintiff has paid thereon an additional amount of $90 and also paid the taxes for

the year 1928. The barn on the premises burned and plaintiff replaced the same with a new one at a cost of about $1,500, of which amount $850 represented proceeds from insurance on the barn that was burned. Owing to the depression and low farm prices, plaintiff was unable to pay anything further under this contract.

In September, 1932, negotiations were had between plaintiff and Bertha Pingel, resulting in the execution of a contract (Exhibit 3), by the terms of which she agreed to accept in full settlement of the previous contract the sum of $4,000. A warranty deed to plaintiff covering the lands was executed by Mrs. Pingel, and an instrument that apparently was a quitclaim deed was executed by plaintiff in favor of Mrs. Pingel. Both instruments were placed in the hands of Mr. R. R. Wolfer, of Jamestown, North Dakota, and the contract provided that in case plaintiff failed to pay the sum of $4,000 within one hundred twenty days both instruments should be delivered to Mrs. Pingel.

At the time the two latter instruments were executed, plaintiff contemplated a loan with the Federal Land Bank to take up the indebtedness. This was known to Mrs. Pingel and discussed between them, as it was with this loan in mind that the latter agreement was entered into, and application to the bank was made immediately thereafter. The economic situation, however, became more acute, and again further negotiations were had with Mrs. Pingel, whereby it was agreed that she should receive $3,000 in full for all her rights and interests in the land under the original contract. The financial stringency became even more pronounced, as was common knowledge, and further negotiations were had on behalf of plaintiff with Mrs. Pingel through plaintiff's agent, Mr. Wolfer, and on March 1, 1933, Mrs. Pingel wrote Mr. Wolfer as follows:

"March 1, 1933

Mr. Ray Wolfer
Jamestown, N. Dak.
Dear Sir:

I received your letter in regard to my land. Now I will take the $2,000 and I will pay the taxes just to get it out of my hands. I would like to hear from you just as soon as you can. I like to get it rented if not sold. Let me hear from you."

The letter was signed by Bertha Pingel and was received by Mr. Wolfer in due course of mail.

On or about March 4 the banking holiday came on, and for a considerable time thereafter funds were not available for any loans on farm lands, or until the Federal Land Bank subsequently approved loans on a more liberal basis. The fact that plaintiff was endeavoring to meet the obligation in favor of Mrs. Pingel by making a loan with the Federal Land Bank and with the land as security, was known to Mrs. Pingel, and no doubt she also had knowledge of the banking situation at the time, and of the difficulty in procuring loans.

The evidence further discloses that the Federal Land Bank subsequently accepted plaintiff's application for a loan in an amount sufficient to satisfy the claim of the defendant Pingel, as indicated in her letter, and such other indebtedness incident to clearing the title to the land involved, and as required by the Federal Land Bank.

It also appears from the evidence that the defendant William H. J. Bohlig was, on the 31st day of May, 1932, adjudged an incompetent person, and his wife was appointed guardian of his person and his property by the county court of Stutsman county. While he was regarded in law as an incompetent, the evidence in this case does not indicate that he needed any assistance with reference to negotiating the land transaction involved, and he appeared to be keenly interested in what he believed to be the making of profitable investments, as he stated in his testimony he was "Always looking for a speculation." He had learned of the contents of Mrs. Pingel's letter to Mr. Wolfer, that she had agreed to take $2,000 for her interests in the land in question, and that she would pay the taxes against the land. Evidently with the purpose of procuring the land, he went out to the Jessen home and interviewed Mrs. Jessen. This occurred about the 8th of March, 1933.

With reference to his mission Mrs. Jessen testified in regard to Mr. Bohlig: "He had a bank deposit slip in his hand with the name Pingel on it, and tried to get information from me what that person's address was and also tried to find out about what she would sell the place for." She testified further that she did not give him any information but told him to see her husband or Mr. Wolfer; and also told him to return some time when her husband was home, and she also said to him, "We was trying to get a federal loan through, or possibly we could get a private

loan to pay Mrs. Pingel, . . ." Bohlig told her that he would return the following Monday. On the Monday indicated, Mr. Bohlig returned to the farm home of plaintiff and stated he understood the place was for sale and that he wanted to buy it. This was on the 12th day of March, 1933. Mr. Jessen informed Mr. Bohlig that he was trying to get the money and settle with the owner. Mrs. Jessen in her testimony states that Bohlig said in reply to this: "All right, if I buy it you understand you can stay here and run the place for me. Suppose we wait a couple weeks and you come in and see me. Q. Who said that? A. Mr. Bohlig. You come and see me if you don't get the money, or Mr. Wolfer doesn't close the deal, . . . Q. Did Mr. Jessen say anything to that? A. He said that is what we will do. I will see Mr. Wolfer, and he said he (Mr. Jessen) had written to his uncle in Chicago trying to deal with him, and if everything failed he would go over and see Mr. Bohlig."

Bohlig, however, did not wait two weeks to hear from Jessen but almost immediately went to Chicago and procured a contract for deed from Mrs. Pingel covering the lands, which instrument (Exhibit 3) provides for the payment of $10 on execution of the contract, and the remainder of $1490 to be paid within six months; and that upon such payment she agrees to convey title by warranty deed to Bohlig. The contract was executed March 16, 1933. Upon his return with the contract, and on March 18, 1933, he again went to the Jessen home, informed Jessen and his wife that he had bought the land from Mrs. Pingel, and showed them her signature to the contract. He also told them he would rent the land to Mr. Jessen, and that if the latter did not rent it he would immediately dispossess them. This came as a surprise to plaintiff and his wife, and plaintiff told Bohlig that he would go to Jamestown that afternoon and see Mr. Wolfer before he would take any further steps. He was unable to see Mr. Wolfer, however, and later in the afternoon met Bohlig and the lease (Exhibit A) was signed by Bohlig and Jessen. Again Bohlig made a hurried trip to Chicago to see Mrs. Pingel, a part of the journey being made by plane, and on March 22, 1933, he paid Mrs. Pingel the remainder of the purchase price under the contract, and took a warranty deed to Mrs. Bohlig as grantee.

The subsequent agreement made in September, 1932, with reference

to the original contract existing between plaintiff and Mrs. Pingel, required that Jessen perform by paying the sum of $4,000 within one hundred twenty days, and that if he failed to do so it was understood a quitclaim deed of Jessen's rights and interests in the land would be delivered to her by Mr. Wolfer, who held the instrument in escrow. However, before the expiration of the one hundred twenty days, negotiations were had with Mrs. Pingel, and she made a further concession to the effect that she would take $3,000 instead of $4,000 in settlement. Still further negotiations were had with Mrs. Pingel by Mr. Wolfer on behalf of Mr. Jessen, with reference to the original contract, and by her letter of March 1, 1933, she agreed to accept $2,000 in full satisfaction, and also pay the taxes on the land. No specific time was set for fulfillment of the terms stated in the letter, and therefore a reasonable time must be implied for compliance; and in determining what is a reasonable time we must take into consideration all the circumstances including the economic situation at the time, and the fact that such funds as Jessen could raise would be by reason of a loan with the Federal Land Bank. These facts were also known to Mrs. Pingel at the time she agreed to take $3,000 in settlement, and also at the time she wrote her letter of March 1, 1933. When Bohlig entered into the contract with Mrs. Pingel for the land, he did so subject to such rights as plaintiff, Jessen, had at the time; and since the Federal Land Bank in regular course accepted the application for loan and was ready to furnish sufficient funds to fully satisfy Mrs. Pingel's interest in the land, the defendants, the Bohligs, were in no better position by virtue of their contract and deed than the grantee, Mrs. Pingel, would have been had she retained her interests in the land.

A question arises whether or not plaintiff, by his actions in entering into a lease of the premises with Bohlig, is estopped from asserting his rights under the original contract as modified by the subsequent agreements and understandings with Mrs. Pingel. It is evident that when he signed the lease he did so under a mistake of facts, and duress, as he was unable to see Mr. Wolfer, and the urgent claims of ownership by Bohlig and the threats to dispossess him and his family are matters which should be taken into consideration. This was the farm home of plaintiff and his family, consisting of his wife and two children, who were dependent upon him. It had been the homestead of plaintiff and

his wife since their marriage on January 1, 1930. In addition to the investment of $1,500, the down payment at the time of the purchase of the land, and a subsequent payment, and the payment of taxes, he had also rebuilt the barn at a cost of $1,500, part of which cost was paid by money procured from insurance on the barn that had burned. The house thereon is valued at $2,000, and the lands, including the buildings and improvements, are of a value of between $4,000 and $8,000. We cannot overlook the effect upon Jessen, in view of the hard economic situation as it existed at that time, when suddenly, and like a thunderbolt out of a clear sky, he is confronted with a threat to take his farm home, and of immediate dispossession, with total loss of his earnings invested and his efforts in acquiring this home, and thus suddenly rendered homeless, and perhaps largely helpless, with a wife and family dependent on him. If Bohlig had not interfered, no doubt the loan with the Federal Land Bank would have been closed and Mrs. Pingel's interests in the land satisfied in accordance with her letter of March 1, 1933.

It is significant that the delivery of the quitclaim deed held by Mr. Wolfer was not demanded until Bohlig secured the contract on March 16, 1933, or immediately thereafter. It is significant also that Bohlig had knowledge of Jessen's contract with Mrs. Pingel, and of the contents of the letter of March 1, 1933. He also knew that this land was the homestead of plaintiff and his family, and had been for several years. While the Bohligs had the right to acquire the interest of Mrs. Pingel in the land, a different situation is presented when they attempt to procure the equitable interests of the Jessens in the land without any compensation by taking advantage of the economic situation as it existed at the time, and by coercion, with threats of dispossession.

The trial court in its findings, among other things, found "Upon obtaining said warranty deed, said defendants, Bohlig, went to the plaintiff and his wife, and after declaring that they had obtained a full conveyance of title to said premises, threatened to immediately evict plaintiff from said premises and to take possession thereof unless plaintiff would make a lease or rental contract of said premises for the year 1933 running to said defendant, William Henry John Bohlig. . . ." The court also found that the plaintiff and his wife, being taken by surprise, uncertain of their rights, and without any proper business or

legal advice, plaintiff signed the instrument purporting to be a lease of the premises for the year 1933.

The court also found that the said contract of purchase not being in any manner cancelled or released was on March 22, 1933, at the time of the execution of a warranty deed of said land by the grantor Pingel to the defendant Harriette Bohlig, in full force and effect. That the letter of Mrs. Pingel of March 1, 1933, did not fix a specific time limit, and that the possession of said land by plaintiff was known to the defendants, the Bohligs, at that time, and that they are held to full knowledge of the extent of plaintiff's equitable rights therein. That in taking said conveyance by warranty deed said defendant Harriette Bohlig purchased only the equitable rights held by said grantor Pingel to make conveyance to plaintiff of said lands upon his compliance with an equitable adjustment of the extent of his rights therein.

We agree with the trial court that at the time of the taking of the deed by Mrs. Bohlig, plaintiff's rights under the original contract with Mrs. Pingel had not been cancelled or determined; and the delivery of the quitclaim deed was without authority. The subsequent negotiations and understandings between plaintiff and Mrs. Pingel had modified, if not nullified altogether, the purpose and effect of the quitclaim deed as a means of determining plaintiff's interests in the land. The object of the quitclaim deed was to reinvest all equitable title and interest in Mrs. Pingel. Its effect, therefore, would be the same as a strict foreclosure of Jessen's equitable interest.

While a vendee has the right to convey all of his rights and interests in land by quitclaim deed upon a sufficient consideration when default exists in the performance of a land contract, where the deed is not strictly used for such purpose in the manner agreed upon, or where subsequent understandings have modified its use, no presumptions are indulged in its favor with reference to its use in a different manner or time than originally agreed upon; and where the purpose of the deed was merely to accomplish a strict foreclosure of the vendee's interests as a substitute for the usual procedure to cancel a land contract, the transaction will be carefully scrutinized.

A strict foreclosure of equitable interests in a land contract has never been looked upon with favor in this state. While cancellations of land contracts by strict foreclosure were permitted where time was made the

essence of the contract, it was essential that the advantage thus given must be exercised promptly upon default in the terms of the contract. Fargusson v. Talcott, 7 N. D. 183, 73 N. W. 207.

Subsequently, however, legislation upon the subject specifically provides against a strict foreclosure. Article 4, chapter 30, Code Civil Procedure, Compiled Laws of 1913 (§ 8122) as amended by §§ 8122 and 8122a, 1925 Supplement to the Compiled Laws of 1913.

Under the provisions of the statutes mentioned, the vendee has one year in which to cure a default after written notice of cancellation is served upon him, unless an action is commenced for such purpose. Said § 8122, 1925 Supplement to the Compiled Laws of 1913, reads, in part:

"No provision in any contract for the purchase of land or an interest in land shall be construed to obviate the necessity of giving the aforesaid notice and no contract shall terminate unless such notice is given, any provision in such contract to the contrary notwithstanding; but the notice herein required shall not be deemed necessary where the contract in question is sought to be terminated by an action at law or in equity brought for that purpose upon failure to perform."

The provision quoted as it exists in its present form first came into our laws by the enactment of chapter 180, Laws of 1915. As stated by this court in Johnston Farm Invest. Co. v. Huff, 52 N. D. 589, 204 N. W. 333, "The remedy of cancellation coupled with forfeiture of payments and improvements, is drastic; when the vendor invokes it the court must give full effect to all contractual provisions calculated to protect the interests of the vendee to the end that he be not summarily deprived of the fruits of many years of labor."

The quitclaim deed given by plaintiff was used arbitrarily and without authority in the circumstances disclosed in this case, and plaintiff could not be thus summarily deprived of his rights and interests in the land; nor do we believe that an estoppel exists by reason of the execution of the lease by Jessen to Bohlig. Aside from the coercion used, the lease was not signed by Jessen's wife, and she has in no manner waived her interests in the premises. Her homestead rights had attached to this land, and while subject to the contract rights of Mrs. Pingel, they could not be defeated except by conveyance as provided by § 5608, 1925 Supplement to the Compiled Laws of 1913, or by cancellation of the contract by proper procedure.

The findings and conclusions of the trial court are approved except as to the amount to be paid by plaintiff to Mrs. Bohlig as guardian. The trial court found that the defendants had paid $1,500 to Mrs. Pingel and had also paid taxes against the land in the sum of $428.43, and ordered judgment for said amounts with interest at six per cent.

Mrs. Pingel's letter of March 1, 1933, provides for a consideration of $2,000 and that she will pay all the taxes then existing against the land. The Bohligs had paid all of the taxes except $38. Since Mrs. Bohlig, as guardian, succeeded to all of the rights and interests of Mrs. Pingel, she would be entitled to recover the sum of $2,000, the amount stated in the letter, less the taxes unpaid and which should have been paid. Estimating the damages on this basis, Mrs. Bohlig is entitled to recover $33.57, in addition to the amount found by the trial court, with interest thereon at six per cent.

The judgment of the trial court provides a definite time in which the parties, respectively, shall perform the contract. The appeal of this case by the defendants, Bohligs, has stayed performance on the part of plaintiff, and as a result the time fixed by the trial court has expired. It is therefore ordered that this case be remanded to the district court, that the judgment be modified as herein indicated, and that the trial court fix a reasonable time for the parties, respectively, to comply with the judgment as modified. Plaintiff will recover his costs on this appeal.

BURR, CH. J., and NUESSLE, BURKE and CHRISTIANSON, JJ., concur.